**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CV-14462-MARRA**

**DIANNE SOLDEVILLA, individually and on behalf of all others similarly situated,**

**Plaintiffs,**

**vs.**

**ON THE BARRELHEAD, INC.,**

**Defendant.**
**_______________________________________/**

**ORDER *SUA SPONTE* REMANDING CASE TO THE NINETEENTH JUDICIAL CIRCUIT IN AND FOR ST. LUCIE COUNTY, FLORIDA FOR LACK OF SUBECT MATTER JURSDICTION**

**THIS CAUSE** is before the Court on a *sua sponte* review of the Court's jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S C. § 1332(d) [DE 34] and Defendant's Response to the Court's Order to Show Cause on jurisdictional proofs [DE 36, 36-1]. The only question now before the Court is whether Defendant has met its burden as to CAFA's amount- in-controversy requirement. For reasons stated below, the Court concludes that Defendant has not done so, and the Court shall accordingly remand the case to the Nineteenth Judicial Circuit in and for St. Lucie County, Florida where it was originally filed.

## I. Background

On October 12, 2019, Plaintiff filed her putative Class Action Complaint against Defendant, On the Barrelhead, Inc. ("OTB"), in the Nineteenth Judicial Circuit and for St. Lucie County, Florida. On November 27, 2019, Defendant OTB removed the action to this Court

asserting subject matter jurisdiction under the Class Action Fairness Act ("CAFA") [DE 1]. Following a threshold challenge to the existence of CAFA jurisdiction raised by the Court, Plaintiff subsequently filed a Second Amended Complaint [DE 23], asserting jurisdiction under the CAFA. Plaintiff alleged that minimal diversity existed, as she is a resident of Port St. Lucie, Florida, and Defendant is a foreign corporation incorporated in Durango, Colorado. Plaintiff further alleged, based on statements made in Defendant's notice of removal, that millions of emails were sent on behalf of OTB throughout the United States during the relevant time period, and that while OTB was unable to identify how many of those emails were sent into Florida, "based on [the defendant's] investigation and the representations made by [defendant's] third party marketers," the amount in controversy in this case exceeds $5,000,000 [DE 23, ¶ 13].

Following submission of this pleading, the Court issued its order directing OTB to show cause as to why the case should not be remanded for lack of subject matter jurisdiction due to insufficient proofs on the amount-in-controversy requirement [DE 34]. Responding to this directive, OTB submitted the affidavit of Jim Calkin, described as a "co-founder" of OTC, who averred that OTC contracted with a third-party marketing company, "Lead Intention Inc.," to handle its email advertising campaign, and that Lead Intention, in turn, contracted with multiple third-party publishers who generated emails sent to consumers throughout the United States on behalf of OTB. (Calkin Declr. ¶4). Calkin concedes he does not know how many emails were generated on OTB's behalf through these third-party publishers, but estimates, using a series of speculative extrapolations, that the number of emails issued to Florida residents exceeds 10,000. (Calkin Declr. ¶ 8).

To make this calculation, Calkin drew from unidentified data supplied by Lead Intention supposedly documenting 5,883 Florida-based leads which it generated on OTB's behalf during the relevant time period. (Calkin Declr. ¶ 6). From here, assuming approximately 25% of OTB's email advertising recipients open emails from the third party publishers, and that 5% of this group then clicks on the provided links to submit financial information to participating financial institutions (Calkin ¶ 7) – numbers Calkins pulls from "OTB's experience" -- Calkin concluded that the number of emails sent into Florida is "many times greater than the number of leads generated," and that "it is more likely than not that more than at least 10,000 emails with the same subject line as the email alleged [sic] received by Plaintiff were sent to Florida residents." [Calkin ¶ 8]. More specifically, he deduced, using the assume "click rate" and "open rate" referenced, that approximately 11,319 emails with same subject line were sent to Florida residents who visited 141 financial websites though the links supplied in its advertising campaign. Caulkin says this number is "consistent with my experience and uunderstanding of the email marketing industry," (Calkin ¶ 10], while also conceding that "OTB does not have any contractual relationship with [the] third party publishers" [and thus] …cannot know the precise number of emails that are sent by any specific third party publisher." [Calkin ¶5].

**II. Class Action Fairness Act ("CAFA") – Removal Legal Standard**

Under CAFA, the burden to establish removability is on the defendant. *Abrego v Doe Chemical Co.*, 443 F.3d 676 (9th Cir. 2006). Where, as here, the amount in controversy is questioned by the Court, "both sides submit proofs and the court decides, by a preponderance of the evidence, whether the amount in controversy requirement has been satisfied. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014).

To demonstrate the amount in controversy for purposes of affirming or denying the propriety of removal, the parties may submit evidence beyond the complaint, such as affidavits, declarations, or other "summary judgment type evidence." Thus, where a declarant submits a "barebones, conclusory statement, " without providing a sufficient evidentiary foundation to confirm his or her personal knowledge about the proffered information, or to explain how he or she arrived at the conclusions reached, it is improper for the court to rely on that declaration, even if the declarant otherwise seems competent and is in a sufficient position with the company to confirm the information. *Richards v Now, LLC*, 2019 WL 2026895 (C.D. Cal. 2019), at *7. Further, while the removing party is not required to "research, state and prove the plaintiff's claims for damages," *Coleman v Estates Express Lines,* 730 F. Supp.2d 1141, 1147 (C.D. Cal. 2010), it cannot establish removal jurisdiction through mere speculation and conjecture, with unreasonable assumptions. *Ibarra v Manheim Investments, Inc*. 775 F.3d 1193, 1197 (9th Cir. 2015). The use of "deduction, inference, or other extrapolation" of the amount in controversy is permitted, but where challenged, the removing party must support its deductins with "evidence combined with reasonable deductions, reasonable inferences or other reasonable extrapolations." *Pretka v Kolter City Plaza II, Inc.,* 608 F.3d 744, 755 (11th Cir. 2010).

**III. Discussion**

In this case, OTB seeks to establish the amount in controversy with proofs derived from calculations offered by "co-founder" Jim Calkins. Calkins' analysis involved several steps. First, he used data allegedly collected by its third-party marketing agent, Lead Intention, Inc., to show that 5,883 Florida-based leads were generated from email campaigns launched on its behalf

through third-party publishers during the relevant time period (Calkins Decl. ¶6). Next, he assumed, vaguely drawing upon "OTB experience," that roughly 25% of its email recipients open the emails, and of that number, roughly 5% "click' on the provided link to visit the website of the associate financial institutions to explore the advertised loan products. (Calkins Decl.¶ 5,). And, although Calkin conceded he does not know how many emails were sent on behalf of OTB through Lead Intention (or the sub-contracting third-party publishers), he nonetheless deduced, based on the assumed "open" and "click" rates above-referenced, that about 11, 319 emails with similar subject lines to those involved here were sent to Florida-based consumers on its behalf (Calkins ¶¶ 8-10). From here, assuming statutory damages in the amount of $500 per recipient, Defendant OTB advances that the amount in controversy clearly exceeds the $ 5 million threshold set under CAFA.

Even affording the most generous reading of Calkin's affidavit, the Court is not persuaded as to the reliability of his methodology. The Court is specficially concerned about the "open" and "click" rates assumed, without any evidentiary sources, as the premise for his formula. Calkin's parsing of the proposed class definition and his deductions from third-party "lead" data – the product of unsupported assumptions about consumer receptivity rates in this regard -- do not constitute "evidence combined with reasonable deductions, reasonable inferences or other reasonable extrapolations" on which a reliable estimate as to the amount in controversy may be made. *Pretka*, 608 F.3d at 754. Defendant has not offered any evidence to show that the assumed consumer receptivity rates represent a reliable method for extrapolating the total number of Florida-based email recipients. Nor does Calkin himself offer any testimonial evidence to support his approach.

It is apparent, from Calkin's concessions, that OTB possesses no data on the number of advertising emails generated on its behalf during the relevant time period, and certainly that it has no data on the number of advertising emails that were specifically directed, on its behalf, at consumers in the State of Florida. As it is apparent from Calkin's affidavit that OTB cannot readily or efficiently calculate the number of persons in Florida to whom its email advertising campaign was directed, a key component of the amount in controversy calculation is absent: This Court will not credit an allegation that thousands of Florida class members exist where there is no evidentiary support proffered for the mathematical calculations on which this supposition rests.

For these reasons, the Court concludes Defendant has failed to establish, by a preponderance of the evidence, that the CAFA amount in controversy requirement is met. Moreover, Plaintiff did not respond to OTB's supplemental jurisdictional statement and proofs, or this Court's Order to Show Cause, as she was invited to do, with any other declarations, affidavits or proofs to support her allegations regarding the amount in controversy. Since this Court has raised an inquiry into the matter, and invited both sides to submit supplemental proofs, Plaintiff cannot fall back on the conclusory assertions of her Second Amended Complaint. *See e.g. Heleine v. Saxon Mortg Service*, 2013 WL 1352257 (D. N.J. 2013).

Concluding that subject matter jurisdiction under the CAFA is lacking, the Court shall *sua sponte* remand the case to Florida's Nineteenth Judicial Circuit in and for St. Lucie County, Florida. *See e.g. Jian-Ming Zhao v. RelayRides, Inc.*, 2018 WL 2096854 (N.D. Cal. 2018); *Rachel v PNC Bank, NA,* 2017 WL 1362034 (S.D. Ala. 2017) (*sua sponte* remanding action for lack of CAFA subject matter jurisdiction); *Potter v. Deland Country Club*, 2011 WL 13299567 (M.D. Fla. 2011); *Anthony C. Megine Law, Inc. v. Healthport*, 696 F.Supp.2d 225 (W.D. Pa. 2010) (company

affidavit did not establish $5 million amount in controversy threshold under CAFA); *PHLD Partnership v. Arch Specialty Ins. Co*, 565 F. Supp. 2d 1342 (S.D. Fla. 2008) (speculative inferences offered by vice-president of property claims, based on aggregate dollar amount of wind/hail deductibles and co-insurance penalties assessed against Florida policies, held insufficient to carry burden of showing CAFA amount in controversy).

## IV. CONCLUSION

Base on the foregoing, it is **ORDERED AND ADJUDGED**:

1. Pursuant to 28 U.S.C. §1447(c), his case is **REMANDED** to Florida's Nineteenth Judicial Circuit in and for St. Lucie County due to lack of subject matter jurisdiction.
2. The Clerk of Court shall close this case and terminate any pending motions as **MOOT.**

**DONE and ORDERED** in Chambers at West Palm Beach, Florida this 18th day of September 2020.

KENNETH A. MARRA
United States District Judge

cc. all counsel